[Cite as *In re R.H.*, 2016-Ohio-5121.]

STATE OF OHIO )  IN THE COURT OF APPEALS
                     )ss:  NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

IN RE: R.H.

C.A. No. 28100

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. DN 14-06-386

DECISION AND JOURNAL ENTRY

Dated: July 27, 2016

HENSAL, Judge.

**{¶1}** Appellant Robert H. ("Father") appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor child, R.H., and placed him in the permanent custody of Summit County Children Services ("CSB"). This Court affirms.

I.

**{¶2}** Robert H. is the father of R.H., born August 8, 2005. The mother of the child, Amy F., ("Mother") did not appeal from the judgment of the trial court. The couple also had another child, Ro.H., born August 30, 2000, whose custody is not a part of this appeal. Mother and Father had been in an off-and-on relationship for nearly 15 years. When CSB became involved with the family, Father was in Oriana House as the result of a domestic violence conviction against another woman, with whom he had been in a recent relationship.

{¶3}    CSB initiated the present action by filing a complaint in juvenile court on June 11, 2014, asserting that both children were neglected and dependent.  The agency alleged that the children were not receiving adequate food or proper supervision; that Ro.H. has been staying with a paternal aunt, Tammy H., because he does not want to reside with Mother; that R.H. has poor behavior and poor attendance in school; that Father is currently in Oriana House for domestic violence and has a history of violent behavior; that Mother has associated with a registered sexual offender; and that Mother has a lengthy history of substance abuse.

{¶4}    Following an initial hearing, CSB was granted emergency temporary custody of the children.  R.H. was placed in the care of a maternal great uncle, Michael Lane, but was soon moved to a therapeutic foster home.  Ro.H. remained in the care of his aunt and under the protective supervision of CSB.  Eventually, this aunt was granted legal custody of Ro.H.  While the aunt was sympathetic to R.H's needs, she was not able to assume care of both boys.  As the case involving R.H. progressed, he was adjudicated neglected and dependent and, upon disposition, was placed in the temporary custody of the agency.

{¶5}    The trial court adopted a reunification case plan with several objectives.  The first requirement was that R.H. and his parents participate in counseling.  The goal of this objective was to help R.H. address the trauma he had experienced and express his anger in positive ways, while R.H.'s parents were to gain an understanding of R.H.'s behavioral and emotional needs.  Second, the parents were to complete substance abuse evaluations and participate in drug screens as requested.  Third, the parents were to complete parenting evaluations, attend parenting classes, and demonstrate that they had learned the skills taught.  Fourth, the parents were to address domestic violence through counseling programs.  Finally, the parents were to be able to provide for the family's basic needs by maintaining stable income, securing a safe and hazard-free home,

developing a budget, and preparing nutritious meals. Weekly supervised visits at the visitation center were scheduled for both parents.

{¶6} In May 2015, the magistrate conducted an in camera interview of the children as they requested to speak to the magistrate in private. In June 2015, the trial court granted legal custody of Ro.H. to the paternal aunt. In October 2015, the trial court appointed independent counsel for R.H. because he wanted to reside with Father, whereas the guardian ad litem supported an award of permanent custody.

{¶7} Eventually, CSB moved for permanent custody of R.H. Following a hearing on the motion, the trial court terminated the parental rights of both parents to R.H. and granted CSB's motion for permanent custody of the child. Father now appeals and assigns two errors for review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT [R.H.] COULD NOT OR SHOULD NOT BE RETURNED TO EITHER PARENT PURSUANT TO [R.C. 2151.414(E)(1)].

{¶8} In his first assigned error, Father challenges the trial court finding on the first prong of the permanent custody test. Satisfaction of the first prong of the permanent custody test requires clear and convincing evidence of one of the five factors set forth in Revised Code Section 2151.414(B)(1)(a)-(e). In that regard, the trial court found that R.H. could not be placed with either parent within a reasonable time or should not be placed with either parent, and, in particular, found that Father failed to remedy the conditions that initially caused R.H. to be placed outside the home. *Se*e R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1). Father disputes this first prong finding, asserting that he had "remedied the majority of the conditions that

brought the child to the court's attention." The trial court also determined that Mother demonstrated a lack of commitment to R.H., but that finding has not been challenged. *See* R.C. 2151.414(E)(4).

{¶9} In addition to general neglect and a lack of appropriate supervision of the children, CSB caseworker Heather Bell testified to the range of serious concerns that initially caused R.H. to be placed outside the home. First, regarding drug-related matters, she reported that R.H. had observed substance abuse by his parents, was able to describe drug buys by Mother, and claimed to have used marijuana with Mother before he was eight years old. Second, regarding sexual matters, R.H. witnessed sexual activity while he was in the same bed as his parents and discovered sex toys in the home. Third, regarding violence, R.H. observed domestic violence between his parents. In one example, R.H. reported that Father strangled Mother and attempted to choke him as well. Fourth, regarding behavioral issues, R.H. was on an individualized educational plan ("IEP") at school, which plan permitted him to attend school only three days a week due to his difficult behaviors. R.H. later explained that one reason he got into trouble at school was to get sent home because he worried about Mother overdosing on drugs. Caseworker Bell explained that R.H. was very involved with adult information about his family. She said he was "definitely in a caretaker role" in regard to his parents.

{¶10} Caseworker Bell also testified about the services provided to the members of the family in an effort to remedy these problems. She reported that Father admitted past substance abuse, but had more recently established negative drug test results for several months. The caseworker stated that she was no longer concerned about Father's possible substance abuse. Mother, however, had a lengthy history of substance abuse involving prescription drugs, heroin, cocaine, and marijuana and had not resolved those problems at the time of the hearing. She

attempted treatment and was sober for three months while in an in-patient program, but quit and checked herself out of the program in March 2015. Mother did not reengage in treatment again until shortly before the December 2015 hearing. The caseworker stated that Mother did not complete this objective.

{¶11} Regarding housing and income, the family's former residence was condemned, as it had dog feces on the floors and the utilities were turned off. Mother has not provided a new address, and her current whereabouts are unknown. Father obtained acceptable housing in August 2015, and he was able to have Thanksgiving dinner for R.H. at that home. Father receives social security disability insurance in an amount considered sufficient to support R.H.

{¶12} In an effort to address anger issues and domestic violence, the couple briefly engaged in joint counseling with the children. The parents were unable to continue in that program, however, because of their animosity towards one another. The therapist who conducted those sessions testified that that there was significant conflict between the parents during the sessions. Therefore, Mother was required to attend Stop the Cycle classes through the Battered Women's Shelter and to engage in individual counseling. Father was required to attend individual counseling to obtain insight into relationships and domestic violence problems. Neither parent completed these attempts to address domestic violence.

{¶13} Father completed a parenting/psychological evaluation with a psychologist assistant who worked under the supervision of a clinical psychologist. The evaluation resulted in several diagnoses that were expected to require lengthy therapy. In addition to the evaluator's observation that Father was unable to demonstrate adequate parenting knowledge, his mental health diagnoses included: intermittent explosive disorder ("IED"), narcissistic personality disorder, a possibility of bipolar disorder, and mild intellectual disability.

{¶14} The evaluator explained that the IED diagnosis caused Father to be very emotionally reactive, resulting in him becoming angry in a manner grossly disproportionate to the source of aggravation. The evaluator and the caseworker both opined that, if untreated, this disorder could be dangerous to children in Father's presence if he is unsupervised, particularly if the children have problems or traits of their own that may instigate a response. This is notwithstanding the fact that Father had previously attended anger management classes four different times. The evaluator recommended individual counseling for anger management because prior classes had been unsuccessful and because Father has problems with comprehension and retention as a result of his composite IQ of 62, denominated as a mild intellectual disability. Father admitted that he has difficulties with reading and writing.

{¶15} The evaluator also explained that the diagnosis of narcissistic personality disorder meant that Father is egocentric and tends to disregard others' feelings and needs. He noted that Father lacked personal insight, "tended to blame everyone else" for his problems, and in particular, blamed Mother for the current involvement of CSB, citing her poor housekeeping and inattention to the children. The therapist who briefly conducted joint counseling for the parents testified that Father had not accepted ownership of his part in family conflicts and consistently projected blame onto Mother. The therapist expressed concern that although R.H. reported that he observed Father engaging in domestic violence with Mother, Father never acknowledged his part in that behavior, but rather just blamed Mother. The guardian ad litem observed that Father generally deflected blame from himself onto others and never acknowledged any role in the trauma suffered by R.H.

{¶16} Although narcissism is considered a permanent disorder, it is said to be somewhat treatable through long-term counseling. Without the appropriate therapy, Father's evaluator

stated that it would be concerning for him to have custody or even unsupervised visitation. Father recently attended his first intake appointment with the counselor and likely faces years of therapy to properly address his mental health issues.

{¶17} Regarding the parenting component of the case plan, Father completed the Fame Fathers program. Once he engaged in the program, the caseworker observed that Father was more receptive to suggestions at visits, was better about giving positive responses to achievements by the children, and was more confident in general. In addition, she said Father attended very regularly and generally did fine at the supervised visits, but the caseworker nevertheless had some concerns about Father's parenting ability. She observed that Father failed to engage in discipline when it was needed. For example, he failed to tell R.H. to get down from the top of some playground equipment, requiring the caseworker to intervene instead. She also noted that Father joked when Ro.H. kicked a ball that hit a lady in the nose, causing her nose to bleed. According to the caseworker, Father conducted himself more as a friend than as a parent to his child. She reported that it took Father a couple of months before he complied with her request to bring food to the dinner-time visits. Father also ignored the caseworker's request to avoid bringing drinks with red dye for his sons. Further, the caseworker said she had occasionally observed Father to be in what appeared to be "a manic state." At those times, Father would become fixated and stuck on one thought. The caseworker said she had to keep redirecting Father to pay attention to R.H. but "there was no talking him down." The guardian ad litem made a similar observation. The parenting evaluator did as well, and he further suggested that Father might have a bipolar disorder. He recommended further evaluation to rule out or confirm that diagnosis. Finally, the caseworker observed that Father occasionally

demonstrated anger during visits. On one occasion, R.H. recalled that Father had once choked him, but Father denied doing so. Father slammed his hands on the table and left the visit angrily.

{¶18} It was anticipated that treatment of Father's mental health issues would require several years of treatment. By the time of the permanent custody hearing, he had attended just one intake appointment with a counselor. Father's mental health diagnoses are, therefore, largely untreated.

{¶19} For her part, Mother did not engage in parenting classes. Mother was inconsistent in her attendance at visits and occasionally left early. Her behavior at visits varied. Sometimes she was very angry at the guardian ad litem, the children, or others at the visit, and other times she was nurturing, open, and receptive. R.H. told the caseworker that when Mother was using drugs, she got very angry. Additionally, there was a great deal of drama during visits about Mother's current boyfriend, Thomas B. Everyone, including R.H., referred to him as "the sex offender" because he was known to be a registered sex offender. Mother and Father argued about Thomas B. a few times, and their emotions once led to a parking lot incident where Mother accused Father of trying to hit her with his car. The caseworker explained to the parents that they were failing to consider R.H.'s well-being in this situation. Nevertheless, the parents continued to argue and talk to R.H. about things that were too mature for him and created worry for him.

{¶20} Caseworker Bell explained that R.H. was initially engaged in counseling with his brother and both parents. Both children objected to the inclusion of Mother in the sessions. The caseworker, observing through a window, saw R.H.'s behaviors increasing and saw family members crying and yelling. She expressed concern that the sessions were counterproductive. In addition, in February 2015, R.H. expressed suicidal ideations. As a result, R.H. was assessed

at Akron Children's Hospital and continued his therapy with Dr. Thomas Reynolds, a child and adolescent psychiatrist with experience in addressing child abuse.

{¶21} In his testimony, Dr. Reynolds stated that he was satisfied as to the veracity of the traumatic events conveyed by R.H. He explained that the child did not make all the disclosures at one time, and the psychiatrist did not detect any secondary gain by the child. He added, "taken as a whole, there were just too many [disclosures] and they were consistent with the behaviors he was showing and the emotion he was showing." In general, Dr. Reynolds reported that at ten years of age, R.H. was "very, very sexualized." His testimony corroborated the testimony of the caseworker as set forth above and added some further details as well. For example, at their first session, Dr. Reynolds played catch with a ball with R.H. as a way to engage. As play continued, R.H. repeatedly threw the ball at the psychiatrist's genitals and laughed. Dr. Reynolds also reported that R.H. was sexually abused by his older brother and a cousin. R.H. reported being exposed to pornography and using the sex toys that he found in the house. He said he observed his uncle masturbating. He reported that Mother had sex with another man, and R.H. was proud that he shot the man with a BB gun in the "butt cheek." He said that he had received reports from the school that R.H. would openly engage in highly sexualized behavior at school.

{¶22} Dr. Reynolds provided medication management for R.H.'s diagnoses of Post Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, and Oppositional Defiant Disorder and otherwise provided therapy for his mental health concerns. He said that R.H. had suffered a number of traumas and described having flashbacks. R.H. was overwhelmed when he thought back about some of the things that had happened. Dr. Reynolds explained that his treatment of R.H. is essentially to help him work through his trauma memories. He said that

R.H.'s treatment was difficult because his heightened sexual behaviors had merged with his aggressive behaviors and because of the custody issue. R.H. reports that he very much loves Father, hates Mother, and wants to be reunified, but feels "caught in that."

{¶23} Dr. Reynolds emphasized that trauma treatment cannot be accomplished if the individual is not in a safe state and stable home. The person needs to perceive his environment as being fair and consistent. Dr. Reynolds said that R.H. was not even close to working through his traumas. Dr. Reynolds expressed caution and said: "I see this boy as really teetering on being functional or afunctional. It's really quite marked. * * * I am scared, truly scared for him if chaos would continue, that he could become sort of involved in that and regress."

{¶24} Dr. Reynolds stressed that R.H. is a very resilient child and explained that R.H. has made tremendous progress in school. Dr. Reynolds stated that it is striking how much better he is doing since he began therapy: "He's a different child." Dr. Reynolds emphasized, however, that it is imperative that R.H. continue with his therapy and medication.

{¶25} Regarding R.H's strained relationship with Mother, Dr. Reynolds opined that R.H. believes Father loves him and Mother does not. He noted that R.H. said Mother did not pay attention to him. He believes R.H. associates neglect much more with Mother than Father. He has some hope that R.H. might be able to eventually mend his relationship with Mother, but does not think that will be possible by living with her.

{¶26} The caseworker similarly reported that R.H. has done well since he was removed from his home. While in foster care, R.H. has been named Student of the Month in his school, has achieved merit roll status, has bonded with the school principal and teachers, has made friends, and overall is doing much better. The caseworker reported that she told R.H. she wanted him to be a child again. At the time of the permanent custody hearing, she said: "Now he is a

kid. He plays with toys. * * * He attends school five days a week. * * * His teachers love him. They do have to work with him still on his behaviors, but he does very well. He gets good grades."

{¶27} The caseworker said that R.H. has consistently expressed that he does not want to live with Mother. She explained that one of R.H.'s biggest concerns is that if he were return to Father, that Mother would end up back in the home and he absolutely does not want that. He would rather not go home if Mother ended up there. Based on history, the caseworker believes Mother would end up in that home because the two have gone back and forth in their relationship for over a decade. The caseworker added that if R.H. were returned to Father's home, she does not believe the two parents would be able to have a working relationship regarding R.H.

{¶28} The caseworker concluded that R.H. needs closure and a safe, stable, steady environment. He needs to know that his needs will be met. She believes Father's untreated mental health diagnoses create a risk of further harm to R.H. She does not believe Father's treatment could be accomplished in six months, but rather would require "[t]ons of treatment over a long period of time." Consequently, she believes that permanent custody is in the best interest of the child.

{¶29} Finally, Father testified on his own behalf. He explained that he loves his son and wants to take care of him as much as he possibly can. He believes he can provide for his son's needs. He denied that he did not always "own up" to his role in R.H.'s life, but claimed that "I've always been there for [R.H.] * * * and I've done everything a father could actually do for [him.]" Father said he told R.H. they would "just go forwards and we can't change the past."

Conclusion

{¶30} Although Father secured satisfactory housing, sufficient income and recently established sobriety, the primary issue that brought R.H. into care was the child's excessive exposure to traumatic events. The professionals who treated R.H. emphasized that he needs a safe environment from which to work through his past traumas and address those issues, while Father stated that he would prefer to leave the past in the past. As found by the trial court, Father played a large part in creating the traumatic environment that brought R.H. into care, yet he has no comprehension of the extent of his role and has not acknowledged his part in the matters that have caused so much pain to this child.

{¶31} The record includes examples of Father becoming angry when R.H. brought up examples of traumatic events from his past. The mental health specialist that treated R.H. testified that the child needs a safe place from which to recall and address his past traumas in order to recover his mental health. Father denied that he would respond similarly in the future, but given Father's negligible efforts to even begin to address his own mental health issues, the trial court reasonably concluded that Father is not presently equipped to address R.H.'s behavioral needs. The mental health professionals who evaluated and treated Father and R.H. testified that they will both require intensive therapy for much longer than six months before they could safely be placed together.

{¶32} The trial court did not err in finding that Father has not remedied the problems that caused the child to be placed outside the home. Nor did the trial court err in finding that R.H. could not be placed with either parent within a reasonable time or should not be placed with either parent. The first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

THE STATE FAILED TO PRESENT CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF [R.H.] PURSUANT TO [R.C.] 2151.414(D).

**{¶33}** In his second assignment of error, Father contends that the trial court erred in finding that permanent custody is in the best interest of R.H., as required for satisfaction of the second prong of the permanent custody test. *See* R.C. 2151.414(B)(1) and R.C. 2151.414(D)(1).

**{¶34}** When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence in his life and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7) to (11) apply. R.C. 2151.414(D)(1)(a)-(e). "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

**1. Interactions and interrelationships of the child**

**{¶35}** As seen from the above recited facts, the child's interactions and interrelationships with his parents are complex. R.H. and Father are well bonded and they proclaim that they love each other. Yet, the caseworker reported that R.H. has acknowledged that Father was responsible for some of the trauma he experienced; it was not all Mother's fault. For his part, Father has not acknowledged any role in the trauma R.H. suffered. R.H.'s therapist

testified that R.H. has recently begun to confront traumatic events from his past, but will need to confront more of his past traumas on his path toward healing.

{¶36} While R.H. has consistently expressed that he "hates" Mother and wants nothing to do with her, R.H. also appreciated the positive time he spent with her, according to the caseworker. Mother had not visited R.H. for four months and her whereabouts were unknown at the time of the hearing, leading the trial court to conclude that she had abandoned her son. She has not appealed the trial court's judgment terminating her parental rights.

{¶37} There are three other relatives with whom R.H. has had relationships. First, his relationship with his brother, Ro.H., has not always been good, but it was said to have improved lately. The brothers have had visits with each other during this case. Second, the paternal aunt who has legal custody of Ro.H. apparently has a positive relationship with R.H. She supervised at least one visit in Father's home. Third, R.H. referred to the possibility of living with a grandmother if things did not work out with Father, but there is no other evidence in the record regarding his relationship with her.

## 2. Wishes of the child

{¶38} R.H. has fairly consistently expressed his wish to reside with Father. The trial court found that the child's expressed wishes were outweighed by other facts in this case, however. The record reveals active involvement by Father in R.H.'s difficult past, Father's failure to acknowledge his involvement, and a reported inability by Father to address and meet R.H.'s needs currently or within a reasonable time. The process of therapy and confrontations of past traumatic events has already revealed conflicts in the relationship between Father and R.H., with the promise of more, according to R.H.'s treating psychiatrist. In addition, the guardian ad litem reported that R.H. indicated to her that if placement with Father did not work out, he would

live with his paternal grandmother because she likes him and he had not seen her in a while. The guardian ad litem interpreted that to mean that R.H. has already developed a back-up plan because he is not certain that a return to Father will be successful.

{¶39} The guardian ad litem believes that an award of permanent custody to the agency is in the best interest of R.H. She testified at length about the difficulty of her decision in this case. She explained that when this case began, R.H. had a lot of behavioral issues and sexualized behaviors. There were no secrets in the family. The parents shared a lot and the boys listened. The boys know a lot about drugs and sexual behaviors that is inappropriate for young children. She explained that all of this made it difficult for R.H. to commit to school.

{¶40} She also explained that R.H. currently has a team of people working with him on his IEP at school and they are very proud of his progress. R.H. is still behind his peers in reading and writing, but he has made incredible strides and progress during the past year. His teachers were said to be "beside themselves with excitement and happiness and really want to see him continue." R.H. has had some issues with his foster mother, some of which may be due to transference issues from Mother, according to Dr. Reynolds. R.H. also knows there may be a huge change in his life, so he is trying to prepare himself and is currently struggling with that idea.

{¶41} The guardian ad litem explained that R.H. is not negative or nasty to Mother at visits, but "tolerates her," "hugs and all." He is very angry with her and has not dealt with that anger as yet, so he tends to stay away from her. She believes R.H. has a bond with Mother, but cannot say that it is a loving bond.

{¶42} She described R.H.'s relationship with Father as "very good" and said that the two love each other. Father has been very good about attending visits and spends time with both

of his sons. When both parents visit at the same time, R.H. tends to gravitate to Father. They usually play ball together. The guardian ad litem said there is not a lot of physical contact between Father and R.H., but the interaction is "very positive." Like the caseworker, the guardian ad litem has seen Father in "sort of a manic state." Based on that behavior, she is concerned that he might have a difficult time pulling himself back from matters with which he has become obsessed.

{¶43} One of the guardian ad litem's greatest concerns is that Father has yet to understand and acknowledge his role in contributing to the trauma the boys have experienced. Instead, she has heard him say many times that he blamed Mother for things that went on. That is very concerning because, based on the testimony of Dr. Reynolds, R.H. needs a stable, loving, supportive environment before he can come to grips with what he has been through and heal. The guardian ad litem does not believe Father is ready to provide that sort of environment for R.H.

{¶44} She emphasized that the issue in this case is not just about providing basic food, clothing, and shelter. She stated that R.H. is "very, very damaged" and needs a lot of therapy. She expressed concern that if R.H. returns to Father immediately, that he will be bringing up more issues of past traumatic events, resulting in more anger and arguments between them. She believes R.H. will not get the healing support he needs because Father is not currently able to provide that support. She acknowledged that R.H. may initially be unhappy about not being placed with Father, but he adapted fairly well to foster care despite not wanting to go there. In addition, Dr. Reynolds acknowledged that R.H. is resilient.

{¶45} The guardian ad litem also explained that R.H. is a natural caregiver. He has taken care of Mother, Father, and his Uncle Mike. R.H. is fiercely protective of Father and, if he

returns to him, his natural tendency will be to take care of him and put himself second. If he does that, the guardian believes, R.H. will not put his time and attention on himself. She believes R.H. needs a window of time to focus just on himself, getting counseling, schooling, and continuing his healing.

{¶46} Accordingly, she did not support granting custody to Father as being in R.H.'s best interest or even granting a six-month extension. She believes that R.H. and Father both have a long way to go, much more than six months' worth of counseling. The guardian ad litem added that after R.H. achieves healing he might be able to go back to his family. Presently, however, she supports an award of permanent custody to CSB and believes that to be in the best interest of the child.

{¶47} On appeal, Father argues that the guardian ad litem's suggestion that some future contact with family might be in the child's interest, detracts from the strength of her recommendation and the best interest finding. We disagree. The law requires that the best interest determination must be supported by clear and convincing evidence. R.C. 2151.414(B)(1). Furthermore, in determining the best interest of the child, the trial court must weigh all the relevant factors in order to find the best option for the child. *See In re Schaefer,* 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 64. We are confident that the decision of the trial court meets the standard of clear and convincing evidence.

### 3. Custodial history of the child

{¶48} Prior to the initiation of this case, R.H. resided with his parents, either together or separately. Father testified that he and Mother lived together until 2010 when Mother abruptly took the boys and went to Florida with another man, James S., for eight months. When she returned, Father reconciled with Mother and resided with her and the boys for two months.

Mother left again, but this time with Thomas B., the registered sex offender, and did not take the boys with her. Father took the boys to his mother's home and they resided there for the summer and for two months into the school year. At that time, Mother returned, took R.H. out of his school, and stayed in Youngstown for three months. They then returned to their Akron home and Mother kept R.H. with her. Father was staying with his own mother. Mother would bring the kids over periodically and would leave the children with him for a couple days at a time. During this period, Father was in a relationship with a woman against whom he was eventually charged and convicted of domestic violence.

{¶49} R.H. was removed from his parents' care in this case on June 11, 2014, when he was nearly nine years old. At that time, he was placed with his maternal uncle, Michael Lane. The agency soon developed concerns regarding Mr. Lane's health and his ability to provide for R.H. On July 10, 2014, R.H. was removed from that home, and he was placed in a therapeutic foster home. Mr. Lane passed away during the trial portion of this case. R.H. has remained in the therapeutic foster home for seventeen months. R.H. is doing well in that foster home, but continues to struggle with behavior, particularly in regard to his foster mother. The foster home is not a foster-to-adopt home, and the foster parents are not interested in adoption.

**4. The child's need for a legally secure permanent placement**

{¶50} There was evidence before the trial court that the child was in need of a legally secure permanent placement and there were no suitable friends or relatives willing and able to provide for his care. No relatives have requested legal custody. The caseworker and guardian ad litem both recommend that permanent custody is in the best interests of the child. Extensive testimony supported a conclusion that Father would not be ready to parent R.H. within the time of an extension, nor could R.H. safely reside with Father within six months. By all accounts, the

therapy needed by R.H. and by Father will take years. Permanent custody is the only means to provide this child with a legally secure permanent placement.

**{¶51}** The trial court considered that R.H. might grieve the loss of Father, but the court also observed that R.H. was described as a very resilient young man, and concluded that he would adjust to the loss when he is in a safe and secure environment.

**{¶52}** Upon consideration, this Court concludes that the evidence clearly and convincingly establishes that permanent custody is in R.H.'s best interest. Father's second assignment of error is overruled.

### III.

**{¶53}** Father's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CARR, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and TABITHA STEARNS, Assistant Prosecuting Attorney, for Appellee.

DIANNE CURTIS, Attorney at Law, for child.

JOSEPH KERNAN, Guardian ad litem.